**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MEDICAL IMPACT COMPANY, LLC<br>d/b/a SALUD EDUCATION,<br><br>Plaintiff,<br><br>v.<br><br>MERITUS MEDICAL CENTER, INC.,<br><br>Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

Plaintiff MEDICAL IMPACT COMPANY, LLC d/b/a SALUD EDUCATION ("Plaintiff" or "SALUD") by and through their undersigned counsel, bring this Complaint against Defendant MERITUS MEDICAL CENTER, INC. ("Defendant" or "Meritus"). In support of its claim, Plaintiff alleges as follows:

## <u>NATURE OF THE ACTION</u>

1. This action arises from Defendant's bad-faith repudiation of a Strategic Alliance and Joint Development Agreement (the "Agreement") under which Plaintiff successfully partnered with Defendant to launch an accredited school of osteopathic medicine in Hagerstown, Maryland.

2. After Plaintiff met every contractual milestone – including the successful launch of the Meritus School of Osteopathic Medicine's first class in July 2025 – Defendant sought to escape approximately $3 million in remaining contractual obligations by repudiating the contract, justified by a pretextual breach accusation which, in addition to being false disregarded and

breached SALUD's bargained-for dispute resolution and notice-and-cure rights under the Agreement.

## PARTIES

3.    Plaintiff Medical Impact Company, LLC d/b/a SALUD Education is a Delaware limited liability company with its principal place of business in Colorado.  It has three members, each of whom is a natural person who is a citizen and resident of Colorado or California.

4.    Defendant Meritus Medical Center, Inc. is a Maryland corporation with its principal place of business located in Washington County, Maryland.

## JURISDICTION AND VENUE

5.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

8.    Personal jurisdiction and venue are proper in this Court because (1) the sole Defendant is incorporated under the laws of Maryland, (2) the sole Defendant maintains its principal place of business in Maryland, (3) the place of performance of the Agreement is Maryland, and (4) the Parties consented to the exclusive jurisdiction of the state and federal courts situated in Maryland in Section 7.15 of the Agreement.  A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.

## FACTUAL ALLEGATIONS

### A. The Parties' Background

9.    SALUD is a joint undertaking by higher education veterans and leading authorities in medical education working to address critical shortages of physicians and healthcare

DM1\20491533.5

professionals, particularly in underserved areas.  SALUD works to develop new medical and health sciences colleges to help meet the demand for physicians and healthcare professionals.

10.     Meritus is a corporation formed under the laws of Maryland with its principal office in Hagerstown, Washington County, Maryland.  It is the largest health care provider in Western Maryland and serves more than 200,000 residents of the tri-state region, including southern Pennsylvania and the eastern panhandle of West Virginia.

11.     Meritus is composed of multiple operating entities, including: Meritus Medical Center, Brook Lane Health Services, Meritus Medical Group, and Meritus Home Health.  It has over 4,000 employees, 500 medical staff members, and 250 volunteers.

**B.  The Strategic Alliance and Joint Development Agreement**

12.     In February 2022, Meritus and SALUD entered into the Agreement, whose main object is the creation and launch of a new, accredited school of osteopathic medicine in Western Maryland – the Meritus School of Osteopathic Medicine ("MSOM").  *See* Agreement § 1.1.

13.     Colleges of Osteopathic Medicine are graduate institutions of higher education, licensed in their home state and accredited by the American Osteopathic Association's Commission on Osteopathic College Accreditation ("COCA") to award the Doctor of Osteopathic Medicine (DO) degree.  The DO is one of two degrees for physicians awarded by U.S.-based institutions, with the other being the more-numerous MD.  Approximately one in seven physicians graduating from medical schools in the U.S. is a DO, rather than an MD.

14.     Before MSOM, Maryland had three medical schools, all in the eastern part of the State.  Two are in Baltimore, at Johns Hopkins University and the University of Maryland, and the third is the Uniformed Services University in Bethesda, whose graduates are commissioned into the uniformed services.

15.    Pursuant to Section 6.1 of the Agreement, the term of the Agreement continues until the later of December 31, 2029, or until the completion of the Services, unless earlier terminated as provided for therein.  *Id.* § 6.1.

16.    The Agreement provides for periodic base fee payments set forth in the Agreement's Exhibit B, as well as performance-based milestone payments tied to specific achievements or events in the Agreement's Exhibit C.

17.    This structure of base fees and performance-based milestones in effect allows Meritus to spread the costs of starting up a new medical school over time – avoiding the difficulty posed by having to front-loaded startup expenses before MSOM could begin taking on students (and thereby obtaining tuition income).

18.    Section 5.4 of the Agreement contains a non-solicitation provision, which states: "SALUD agrees that during the Term of this Agreement and for a period of two (2) years following the termination or expiration of this Agreement, it shall not make any solicitation to employ MERITUS' personnel without the written consent of MERITUS to be given or withheld in MERITUS' sole discretion."  Agreement § 5.4.

19.    Section 6.2(f) of the Agreement permits Meritus to terminate the Agreement for Cause, but only "after provision to SALUD of reasonable notice and a reasonable opportunity to cure[.]"  *Id.* § 6.2(f).

20.    "Cause" as defined in the Agreement includes,

SALUD's below standard refusal or failure to act in accordance with a specific written directive of MERITUS provided that such directive is consistent with the Project Plan and the proper pursuit of the approvals necessary to achieve the licensing, accreditation and operation of the COM and is otherwise in compliance with Applicable Law; a violation of MERITUS' policies and procedures that have previously been disclosed to SALUD where the policy or procedural directive is consistent with the Project Plan; failure to maintain professionally proper and ethical working relationships with MERITUS' employees, contractors,

credentialed providers, or relevant federal, state, and accreditation agencies/bodies; use of MERITUS' funds in violation of established MERITUS policies and procedures that have previously been disclosed to SALUD; other just cause as recognized under Maryland law.

21. Section 7.14 of the Agreement provides for pre-litigation dispute resolution rights and procedures. The Agreement explains that those provisions embody the parties' intent that they "shall try to settle their differences amicably between or among themselves. It is the intent of the parties that disputes pursuant to this Agreement be resolved informally and promptly through good faith negotiation." *Id.* § 7.14(a).

22. To that end, Section 7.14(b) provides for an escalating series of pre-litigation dispute resolution mediation mechanisms:

> Any party may initiate such informal dispute resolution by sending written notice of the dispute to the other party, and within ten (10) days after such notice, senior management level representatives of MERITUS and SALUD shall meet, in person or by telecommunications, for attempted resolution by good faith negotiations. Such representatives shall be empowered and authorized to bind their respective companies with respect to the matter in dispute, and to settle the issue on behalf of their respective companies. If such representatives do not resolve such dispute within thirty (30) days of receipt of the dispute notice for any reason, the parties agree to submit the dispute to the President of MERITUS and Chief Executive Officer of SALUD for resolution. If such officers do not resolve the dispute within thirty (30) days after submittal, then the parties agree to promptly submit the dispute to mediation with an independent mediator. In the event mediation is not successful in resolving the dispute, the Parties may proceed to protect and enforce their respective rights by suit in equity or action at law.

23. Additionally, Section 7.16 of the Agreement provides for consequential damages for lost profits and opportunities when a party's breach involves willful, wanton or malicious actions.

24. Section 7.14(b) further provides for prevailing-party fee-shifting in the event of litigation.

5

### C. SALUD Guides the Ship

25.    SALUD fully performed its obligations under the Agreement, met all contractual milestones, and earned performance bonuses along the way.

26.    With SALUD's guidance, MSOM has been able to attract talent and obtain the necessary regulatory approvals to open its doors.  But, the path to that capstone success was not easy – and was made significantly harder due to Meritus's unwise conduct.

27.    In January 2025, just months before classes were set to begin at MSOM, the school's founding Dean, Dr. Paula Gregory, DO ("Dr. Gregory"), unexpectedly resigned due to friction with Meritus's leadership.

28.    Upon her resignation, Meritus immediately designated Dr. Aaron George, DO ("Dr. George") as interim Dean to replace her, without consulting with SALUD.

29.    Upon learning of Dr. George's installation, COCA informed Meritus that he lacked the credentials and experience necessary for the position.  Meritus's hasty and unwise action jeopardized MSOM's ability to open on time.

30.    As a result, Meritus asked SALUD to find an interim replacement for Dr. Gregory. SALUD conducted a prompt review and search and recommended elevating Dr. Murray Berkowitz, DO ("Dr. Berkowitz"), at that time a department chair at MSOM, to interim Dean.

31.    Meritus followed SALUD's recommendation, and promoted Dr. Berkowitz to interim Dean, and informed COCA of the change.  Dr. Berkowitz met with COCA's approval.

32.    Dr. Berkowitz led the school on an interim basis, including successfully presiding over its first academic research conference in March 2025.

33.    SALUD having solved its immediate problem, Meritus requested that SALUD initiate a search for a permanent Dean to replace Dr. Gregory.  Pursuant to that process, SALUD developed a candidate list for permanent dean which included Dr. Berkowitz.

6

DM1\20491533.5

34.     Despite having already seen the poor results coming from jumping the gun and acting on its own, and despite having specifically asked SALUD to conduct a search, in May 2025, MSOM abruptly informed Meritus that it had decided to retain Dr. Brian Kessler, DO ("Dr. Kessler") as the permanent Dean.

35.     Dr. Kessler had not been in the SALUD pool of candidates, and Meritus did not seek SALUD's input before selecting him, or even warn it that Meritus was selecting a candidate outside of SALUD's search process.

36.     Instead, Meritus's President and CEO, Dr. Maulik Joshi, simply announced Dr. Kessler's appointment on the MSOM website on May 15. 2025, selecting him rather than either retaining Dr. Berkowitz as the permanent Dean or following SALUD's search process.

37.     Meritus's retention of Dr. Kessler was so hasty that COCA was still addressing Dr. Berkowitz as MSOM's Acting Dean in communications with him and with Meritus's leadership *after* Dr. Joshi's May 15 public announcement.

38.     Meritus had thus chosen to disregard SALUD's search process, and passed over Dr. Berkowitz – effectively demoting him back to his prior role as a department chair – in favor of an outside candidate SALUD had not recommended.

39.     As a result of this snub, Dr. Berkowitz resigned from MSOM faculty, and moved to Georgia.

40.     In August 2025, after having left MSOM and moved out of state, Dr. Berkowitz was hired by the Valley College of Osteopathic Medicine ("Valley COM"), a new school of osteopathic medicine in Arizona set to matriculate its first class in 2026, as an Associate Dean under that school's Dean, Dr. Alissa Craft, DO ("Dr. Craft").

DM1\20491533.5

41.     Despite these difficulties created by Meritus's frequently-imperious conduct, the inaugural class of medical students at MSOM underwent their White Coat Ceremony in July 2025, marking the start of their matriculation as doctors.

42.     With that success, MSOM became the first new non-military medical school in Maryland since Johns Hopkins's in 1893, and the first in the critically under-served western part of the State.

### D.  Meritus' Wrongful Repudiation

43.     With the MSOM open and the key objective of the Agreement successfully achieved, and the most difficult obstacles already overcome, Meritus decided to willfully breach the Agreement to deprive SALUD of its contractual rights despite having fully and successfully performed (the "Willful Breach Plan").

44.     Pursuant to the Willful Breach Plan, Meritus's decided to utilize, as a pretext for this rug-pull, its own botched handling of MSOM's search for a permanent Dean.

45.     Putting the Willful Breach Plan into effect, Dave Lehr ("Lehr"), MSOM's Chief Strategy Officer, called SALUD on October 23, 2025.

46.     On the call, Dr. Lehr requested that SALUD agree to accept less than it was owed under the Agreement now that MSOM was open and the hardest part of the project was done.

47.     Lehr acknowledged that Meritus could not have successfully launched MSOM without SALUD, and that SALUD had fully performed under the Agreement to date, but Lehr communicated that Meritus simply did not want to keep making the contractually-obligated payments to which it had agreed, and to which SALUD's hard work entitled it, now that the school was open and the hardest part was done.

DM1\20491533.5

48.     Next, Dr. Lehr disclosed that Dr. Berkowitz had left MSOM and begun working for Valley COM, which Dr. Lehr insisted constituted a breach of the Agreement's non-solicitation provisions.

49.     Of course, this was nonsense.  Dr. Berkowitz left MSOM because Meritus – without consulting or warning SALUD – had demoted him, not because he was solicited to leave.

50.     But, just as critically, SALUD has no affiliation with Valley COM.  Even if Valley COM *had* solicited Dr. Berkowitz to induce him to leave, Valley COM's actions aren't a breach of *SALUD's* contractual duties.

51.     On the call, Dr. Lehr did not allege any such connection.  Instead, he insisted that because Dr. Craft had provided consulting services to SALUD during its work getting MSOM open, Valley COM's hiring of Dr. Berkowitz constituted solicitation – an accusation which amounts to little more than word association.

52.     Dr. Craft is a pediatrician, medical educator, and university administrator with a national reputation.  Among Dr. Craft's past accomplishments and accolades are that she served as the Secretary of COCA, and was the Director of Medical Education for Samaritan Health Services in Oregon, a role in which she was instrumental in opening the College of Osteopathic Medicine of the Pacific – Northwest in Yakima, Washington.  That is, Dr. Craft has specific experience in medical school administration specifically involving newly-opening schools of Osteopathic Medicine in underserved rural communities.  Her advice and consulting services were invaluable to SALUD in guiding MSOM to its opening.

53.     Meritus's identification of Dr. Berkowitz's employment at Valley COM was simply a fig leaf Meritus reached for as pretext for the Willful Breach Plan.  The real object and purpose were simply to stiff SALUD for the payments due under the Agreement, now that SALUD

9

had done the heavy lifting of bringing MSOM to the point of opening as an accredited degree-granting college of osteopathic medicine.  Had Dr. Berkowitz decided to retire, instead, Meritus would have reached for some other strained pretext instead.

54.    Nevertheless, following through on the Willful Breach Plan, on November 11, 2025, Meritus repudiated the Agreement via a document it styled a "Formal Notice of Termination."  Meritus recited that Dr. Berkowitz's employment with Valley COM, violated either Section 5.4 of the Agreement (restricting solicitation of Meritus personnel) or Section 6.2(f) (requiring SALUD to "maintain professionally proper and ethical working relationships with Meritus' personnel") and purported to 'terminate' the Agreement.

55.    Meritus did not provide SALUD with reasonable notice and opportunity to cure prior to the putative termination, despite a contractual obligation to do so, nor did Meritus comply with the dispute resolution procedures set forth in the Agreement.

56.    Nor, fundamentally, was the supposed grievance genuine: Dr. Berkowitz had not been solicited to leave MSOM by anyone, nor was Meritus aggrieved by his decision to remain in the osteopathic medical education field after Meritus passed him over, having independently decided that it preferred Dr. Kessler as Dean.  Rather, Dr. Berkowitz left MSOM when Meritus decided not to retain him on a permanent basis in the position in which he was already then serving.  Meritus made that decision without consulting with SALUD, or following the dean selection process SALUD was (at Meritus's request!) preparing.  Dr. Berkowitz's employment with Valley COM was simply the nearest pretext at hand.

57.    Meritus did not have a *bona fide* belief that it had grounds to terminate the Agreement based on Dr. Berkowitz's affiliation with Valley COM, nor was that affiliation the basis for the putative termination on November 11, 2025.  Rather, as per the Willful Breach Plan,

10

Meritus was deliberately breaching the Agreement because, SALUD having gotten MSOM off the ground, Meritus simply no longer wanted to adhere to its contractual obligations any longer.

58.     The entire purpose of the Agreement's fee structure was to spread the startup expenses over time, to avoid front-loading the costs before MSOM could open and begin taking in tuition income.  By pretextually terminating, the true purpose of the Willful Breach Plan is ultimately to avoid payment obligations for services that have largely *already* been performed, and for which Meritus has already reaped the benefits.

59.     Subsequently, the parties engaged in mediation in Rockville, Maryland, on April 2, 2026.  Mediation proved fruitless, necessitating this suit.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

52.     Plaintiff hereby incorporates by reference the allegations in the preceding paragraphs.

53.     The Agreement constitutes a valid and enforceable contract between SALUD and Meritus.

54.     On November 11, 2025, Meritus repudiated the Agreement.

55.     At the time of Meritus's repudiation, SALUD had fully performed all of its theretofore existing obligations under the Agreement.

56.     Meritus's repudiation constitutes a total breach of the Agreement as of November 11, 2025.

57.     Additionally, Meritus's repudiation was a willful breach of the Agreement, as it was fully aware that there was no *bona fide* basis to terminate the Agreement, authorizing the recovery of consequential damages under Section 7.16 of the Agreement.

11

58.     Among these consequential damages recoverable under the agreement are the injuries to SALUD's reputation sustained as a result of Meritus's willful breach.

59.     The United States faces a critical shortage of trained and educated medical professionals, making the creation and expansion of accredited medical education programs a key growth area.  SALUD's work in starting up MSOM – the creation of a new medical school in an underserved area – is demonstrable proof of its capabilities and performance.  But for Meritus's willful breach, which it purports to characterize as a for-cause termination despite subjective knowledge that no such cause exists, SALUD would be able to leverage that success to attract further business in developing and expanding medical higher education programs and facilities in the United States.

60.     Meritus's willful misconduct has impaired SALUD's ability to leverage that proven success, consequentially depriving SALUD of profits from new and additional business it would otherwise have secured.

61.     As a direct and proximate result of Meritus' breaches, SALUD has sustained and will continue to sustain significant financial damages.  Plaintiff's damages from these breaches include but not limited to: the remaining payments due under the Agreement, totaling approximately $3,000,000; consequential lost profits in an amount to be proven at trial; pre-judgment and post-judgment interest; and such other damages as will be proven at trial.

62.     Further, Section 7.14 provides for prevailing-party fee-shifting, entitling SALUD to payment of all its fees, costs, and expenses in prosecuting this action.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment under 28 U.S.C.A. § 2201

63.     Plaintiff hereby incorporates by reference the allegations in the preceding paragraphs.

DM1\20491533.5

64. An actual controversy exists between the parties regarding whether Meritus' pretextual allegation that Dr. Berkowitz's affiliation with Valley COM constitutes breach of the Agreement.

65. SALUD did not solicit Dr. Berkowitz to leave employment at MSOM, or to affiliate with Valley COM.

66. Rather, Dr. Berkowitz left employment with MSOM after it – without consulting SALUD and in derogation of the selection process SALUD was preparing at Meritus's instructions – passed Dr. Berkowitz over for the permanent position of Dean.

67. Dr. Berkowitz's subsequent decision to affiliate with Valley COM was undertaken without knowledge or involvement by SALUD.

68. Dr. Berkowitz's disaffiliation with MSOM, and his affiliation with Valley COM, do not constitute solicitation by SALUD, or otherwise constitute breach of any obligation in law or contract by SALUD.

69. Moreover, even if, *arguendo*, there was any basis to find breach of the Agreement based on Dr. Berkowitz's disaffiliation with MSOM and affiliation with Valley COM, Meritus breached its duty to provide SALUD with notice and opportunity to cure, such as is provided for by Section 6.2(a) and 6.2(f) of the Agreement.

70. Further, even if, *arguendo*, there was any basis to find breach of the Agreement based on Dr. Berkowitz's disaffiliation with MSOM and affiliation with Valley COM, Meritus further breached the Agreement by failing to follow the dispute resolution procedures before terminating and repudiating the Agreement, as required by Section 7.14 of the Agreement.

71. Plaintiff seeks a judicial declaration that:

    A. SALUD did not breach the Agreement prior to Meritus's repudiation;

DM1\20491533.5

B.  Meritus' purported termination of the Agreement was invalid and without effect, and instead constituted repudiation; and

C.  Meritus's obligations under the Agreement have at all times remained in full force and effect.

72.  Further, Section 7.14 provides for prevailing-party fee-shifting, entitling SALUD to payment of all its fees, costs, and expenses in prosecuting this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff SALUD respectfully requests that this Court enter judgment in its favor and against Defendant, as follows:

A.  Finding that Defendant Meritus repudiated the Agreement on November 11, 2025, constituting total breach;

B.  Ordering Defendant Meritus to pay direct damages totaling an amount to be determined at trial, and not less than $3,000,000 plus pre- and post-judgment interest;

C.  Ordering Defendant Meritus to pay consequential damages for willful breach in an amount to be determined at trial, plus pre- and post-judgment interest;

D.  Finding that Plaintiff SALUD did not breach the Agreement;

E.  Awarding Plaintiff counsel fees and expenses incurred in connection with this action as the prevailing party in accordance with the contractual fee-shifting clause; and

F.  Grant such other and further relief the Court may deem just and proper.

[*Signature Page Follows*]

14

DM1\20491533.5

Dated:  April 3, 2026

Respectfully submitted,

**DUANE MORRIS LLP**

*/s/ Allison M. Bortner*
Allison M. Bortner (Bar No. 19860)
1201 Wills Street, Suite 330
Baltimore, MD 21231
Telephone: (410) 949-2900
AMBortner@duanemorris.com

OF COUNSEL:

Richard L. Renck (*District of Maryland application for admission forthcoming*; MD Bar No. 2111220002)
1201 N. Market Street, Suite 501
Wilmington, DE 19801
Telephone: (302) 657-4900
Fax: (302) 250-4826
RLRenck@duanemorris.com

*Attorneys for Plaintiff Medical Impact Company, LLC d/b/a SALUD Education*

15