**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MEDICAL IMPACT COMPANY, LLC** <br> **d/b/a SALUD EDUCATION** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Case No: 1:26-cv-01327-ABA** |
| | : | |
| **MERITUS MEDICAL CENTER, INC.** | : | |
| | : | |
| **Defendant** | : | |

**MERITUS' COUNTERCLAIM**

COMES NOW the Defendant / Counter-Plaintiff, Meritus Medical Center, Inc., (hereinafter "MERITUS"), by and through its counsel, John J. Murphy, Esq., and Walker, Murphy & Nelson, LLP, and, pursuant to the Federal Rules of Civil Procedure, files this Counterclaim against Medical Impact Company, LLC d/b/a SALUD Education, and in support thereof states as follows:

**Contract Formation and Terms**

1.      In early 2021, leadership at MERITUS sought to create a new medical school – the first of its kind in Western Maryland – to train future generations of health care providers for the local community.  To assist with that endeavor, on February 22, 2022, MERITUS entered into a "Strategic Alliance and Joint Development Agreement" (hereinafter "Agreement") with Medical Impact Company, LLC, d/b/a SALUD Education (hereinafter "SALUD").[1]

---

[1]     This Agreement was attached to Plaintiff's Complaint and is the subject of a disputed and opposed "Motion to Seal" which is being filed contemporaneously with this Counterclaim.

2.      During early discussions with SALUD before entering into the Agreement, MERITUS was excited about the prospect of partnering with a third-party consultant purportedly sharing its own values.  For example, according to its website, "[b]uilding medical schools and training students in underserved regions and communities is part of [SALUD's] commitment" while its "values" included "expanding access" to healthcare, "sharing [its] knowledge," focusing on "patient-centered care," "increasing diversity," and "addressing the physician shortage."  *See, e.g., https://saludeducation.com/*

3.      With values and mission seemingly aligned, MERITUS and SALUD entered into arms-length negotiations for a consulting agreement.  Importantly, because MERITUS is a 501(c)(3) entity, SALUD's compensation for the project would be strictly monetary for services rendered and milestones achieved; not an equity interest as was SALUD's normal model for for-profit institutions such as the planned Maryland College of Osteopathic Medicine at Morgan State University.

4.      Incorporating the pre-formation discussions between the parties into the Agreement, SALUD expressly represented it "is engaged in the mission of developing and operating advanced health professions schools of education".  *See,* Agreement at Recital A. SALUD promised to act "as a consultant and advisor to perform the consulting services" in connection with the formation and implementation of a new Meritus School of Osteopathic Medicine ("MSOM").  *Id.* at ¶ 1.1.  Further, as an express and material term of the contract, "SALUD attests that it will provide the Services with professionalism, loyalty, punctuality and competence, in accordance with best practices."  *Id.* at ¶ 1.2.

5.      Other key terms of the Agreement that induced MERITUS to sign included a non-solicitation provision that stated:

> Non-solicitation. SALUD agrees that during the Term of this Agreement and for a period of two (2) years following the termination or expiration of this Agreement, it shall not make any solicitation to employ MERITUS' personnel without the written consent of MERITUS to be given or withheld in MERITUS' sole discretion. ¶ 5.4

Along with a separate provision that provided:

> Misconduct of Key Individuals. MERITUS may terminate this Agreement after provision of written notice and a reasonable opportunity to cure if it determines, in its good faith reasonable judgment that a Key Individual or Key Individuals have engaged in personal dishonesty, willful misconduct, intentional failure to perform stated duties, willful violation of any law, rule or regulation materially related to the Project (other than traffic violations or similar offenses), disparagement of the business or affairs of MERITUS, or has engaged in conduct that adversely affected or would be reasonably likely to materially adversely affect the operations or reputation of MERITUS; ¶ 6.2(e)

With respect to the parties' intellectual property, each transferred an ownership interest to the other but, importantly, there was no agreement to transfer the parties' intellectual property to third parties. *Id.* at Article III.

6.      Specific to the monetary compensation aspect of the Agreement, in January 2022 MERITUS memorialized a conversation with SALUD's principal to come up with a financial structure "to take into account [MERITUS] non-profit realities." The financial agreement that stemmed from those discussions was large annual payments and incentives during the early years of the project, then smaller management fees in later years for ongoing services SALUD was to perform including, but not limited to, obtaining regional accreditations, Title IV Eligibility, assistance with clinicals and the residency programs, increasing class size, and launching new programs, to name a few key components, none of which SALUD has provided. *See,* Agreement at Exhibits B and C.

7.      Demonstrating that SALUD's work it was to perform under the Agreement was relatively nominal, MERITUS has committed in excess of $200 M in funding to the establishment of its Medical School, more than 10 times the maximum value of its Agreement with SALUD.

**SALUD's Introduction Of A Key Individual With Direct Competing Interests**

8.      From nearly the outset, SALUD introduced Dr. Alissa Craft as a Key Individual who regularly interacted with MERITUS. Indeed, a review of the extensive communications between MERITUS and SALUD throughout the engagement reveals that Dr. Craft was not merely one of several SALUD contacts – she was the primary and most active interface between SALUD and MERITUS, involved in virtually every aspect of the school's development.

9.      Consistent with that deep operational role, MERITUS shared sensitive institutional information with Dr. Craft that it would never have shared but for SALUD's representations that she was part of SALUD and acting as MERITUS' fiduciary.

10.     By way of example, MERITUS provided Dr. Craft with its complete, signed faculty roster in connection with the preparation work for obtaining its Commission on Osteopathic College Accreditation ("COCA"), trusting her with the school's most sensitive personnel data.

11.     MERITUS also exchanged, edited, and improved virtually all of its organizational and operational documents with Dr. Craft and, further, placed extraordinary trust in her by expressly tasking SALUD – and Dr. Craft specifically – with leading the search for MSOM's permanent Dean after the founding dean resigned.

12.     At all times relevant hereto, SALUD affirmatively cloaked Dr. Craft in both apparent and actual authority by holding her out as an employee and utilizing an internal SALUD email address for her; acraft@saludeducation.com.

13.     More alarmingly, at no time did SALUD disclose to MERITUS that Dr. Craft was only a part-time independent contractor for them, with a full-time position as the Founding Dean of The Valley College of Osteopathic Medicine ("Valley COM"), a competing osteopathic medical school in development located in Phoenix, Arizona.

14.     Had MERITUS known that its purported consultant and trusted fiduciary was simultaneously building a competing osteopathic institution, it would have never permitted Dr. Craft unfettered access to MERITUS' personnel, operations, and strategic directional decisions.

**Unravelling Of The Business Relationship And The Departure Of Dr. Berkowitz**

15.     After MERITUS' founding dean resigned and it was forced to find an interim dean, initially SALUD principal Dr. George Mychaskiw did not view Dr. Murray Berkowitz, one of MERITUS' then-existing faculty members and Chair of the Osteopathic Medicine Department, as the best candidate for an interim dean.

16.     Thereafter, Dr. Craft personally conducted the initial screening interview of Dr. Berkowitz on January 21, 2025, giving her unique and privileged insight into his professional aspirations, his candidacy for the Dean role, and even his personal background.

17.     With SALUD's input, and notwithstanding Dr. Mychaskiw's reservations, in February 2025, Dr. Berkowitz was named Interim Dean and Interim Chief Academic Officer of the school.  In that role, he served admirably until July 2025, when Dr. Brian Kessler was hired as the school's permanent Dean.

18.     Surprisingly, despite its purported industry connections and expertise, as part of the search for a permanent dean candidate, Dr. Kessler was not on SALUD's list of potential candidates.  This was telling, insofar as Dr. Kessler's credentials were impeccable; he served on the Board of Directors of the National Board of Osteopathic Medical Examiners (NBOME) and

the Commission on Osteopathic College Accreditation (COCA), was recent president of the American College of Osteopathic Family Physicians (ACOFP), was then the current dean and professor of family medicine at Campbell University's Jerry M. Wallace School of Osteopathic Medicine in Buies Creek, N.C, and before that was dean at Lincoln Memorial University in Harrogate, Tennessee.

19.    Also, around this same time, SALUD introduced Joshua Figuli, son of SALUD principal David Figuli, to MERITUS to help it find a solution to institutional accreditation challenges it was navigating as COCA began limiting their role to a program accreditor only, and requiring colleges to seek a separate accreditor for the institution.  As MERITUS was beginning to learn, SALUD had overpromised on its ability to successfully guide its school on a path to full accreditation.

20.    When Dr. Kessler came on board as the new school dean, Dr. Berkowitz returned to his faculty position.  This transition was entirely expected and not some new or novel approach, with Dr. Kessler having on two previous occasions joined an institution as permanent Dean, with the outgoing interim dean returning seamlessly to a faculty role. Indeed, Dr. Kessler was fully comfortable with and supportive of Dr. Berkowitz's return to his faculty position and MERITUS had every reason to expect that he would remain a valued member of its faculty.

21.    On July 27, 2025, Dr. Berkowitz tendered his formal resignation from the school, placing MERITUS in a precarious position insofar as to maintain accreditation, it needed to have a certain number of faculty on staff, especially in Dr. Berkowitz's OMM department, and Dr. Berkowitz's departure forced the school to scramble and find his replacement.

22.    As MERITUS "consultant and advisor" attesting to abide by laudable standards including "professionalism, loyalty, punctuality and competence, in accordance with best

practices," SALUD was well-aware of the harm that would be caused by poaching its faculty members and certainly wasn't a danger MERITUS was anticipating or expecting.

23.    In the weeks that followed, MERITUS was shocked to learn that not only was Dr. Craft simultaneously serving as the founding dean of a competing school of osteopathic medicine, but she was directly involved in soliciting Dr. Berkowitz to accept a faculty position at her school over MERITUS.

24.    Having since learned Dr. Craft was instrumental in bringing Dr. Berkowitz from MERITUS to Valley COM, it seems all but certain that Dr. Craft also misappropriated MERITUS' intellectual property for incorporate and use at Valley COM.

**Termination Of Contract And Subsequent Discoveries**

25.    Against this backdrop of underperformance and the shocking discovery that SALUD failed to disclose Dr. Craft's material conflict of interest that then led directly to the loss of a key faculty member and, presumably, the dissemination of its intellectual property that had been shared with her, MERITUS' principal contacted SALUD's principal in a good faith effort to amicably end the parties' business relationship.

26.    At no time did SALUD deny Dr. Craft's clear conflict of interest in her dual role of simultaneously working for Valley COM and SALUD, or that SALUD failed to disclose this conflict to MERITUS.

27.    Thereafter, MERITUS formally terminated its Agreement with SALUD on November 11, 2025.  Rather than acknowledge it had made a mistake in not disclosing Dr. Craft's dual role and then try and reach an amicable resolution, SALUD instead was defiant as to any wrongdoing and demanded that MERITUS immediately pay the full remaining balance due under

7

the Agreement, notwithstanding the fact that said compensation was dependent upon SALUD performing additional service and reaching additional milestones which had not yet taken place.

28.    After reaching an impasse and agreeing to private mediation to satisfy a condition precedent pursuant to their Agreement, MERITUS began to delve deeper into SALUD and its principals discovering, among other things, the following:

a.    After announcing in 2020 that SALUD was partnering with Morgan State University to open a new, for-profit, school of osteopathic medicine, that project ran into continual delays.  Not only was SALUD unsuccessful in delivering an accredited medical school to Morgan State, but by the summer of 2025 those parties agreed to terminate their contract.  Morgan State is now moving forward with plans for a not-for-profit medical school absent SALUD's involvement.

b.    In September 2024, SALUD principal David Figuli and his son, Joshua Figuli, initiated federal racketeering claims against executives of the now-defunct Hussian College, alleging close to $160,000,000 in damages due to embezzlement and other serious misconduct.  Regardless of whether or not the claims are substantiated, from this litigation MERITUS has learned that one of SALUD's principals, and one of its consultants assigned to assist MERITUS under the Agreement, had owned a multi-state for-profit college that suddenly collapsed, with almost no notice to its faculty and students, in June 2023, after years of financial troubles and mismanagement under their watch.

29.    Against this backdrop of having lost its contract with Morgan State, and at least several of its key individuals embroiled in an embezzlement scandal resulting in the collapse of a

multi-state college system on their watch, twenty-four (24) hours after an unsuccessful mediation, SALUD initiated this litigation falsely portraying itself as deserving all the credit for MERITUS' success while simultaneously disparaging MERITUS' business acumen.

### COUNT I:  Fraudulent Inducement

30.     MERITUS incorporates herein by reference the allegations above as if set forth fully herein.

31.     During the negotiation phase of the Agreement, MERITUS relied upon SALUD's self-portrayal, through party discussions and SALUD's own marketing materials, that the parties' interests, mission and values were singularly aligned in creating medical schools to address a national shortage of physicians.

32.     As part of those representations, which were incorporated broadly into the Agreement, SALUD further promised and represented that it would act as MERITUS' fiduciary with the highest ethical and professional standards as memorialized in the Agreement.

33.     At no time either during the contract formation stage, or in the Agreement, or even in the months operating under the Agreement, did SALUD disclose any dual employment or conflict of interest Dr. Craft had as the founding dean of a competing school.

34.     SALUD's representations of mission, values, ethics and professionalism were materially false as no competent fiduciary would cloak an outside individual in actual authority and not disclose all potential, much less actual, conflicts of interest.

35.     SALUD made said misrepresentations with actual knowledge that it could not comply with the terms of the Agreement absent Dr. Craft's central role, yet MERITUS would never consent to her involvement if her conflicts had been disclosed.

36.    MERITUS justifiably relied upon SALUD's verbal assurances and marketing efforts, actually incorporated into the Agreement, when hiring SALUD as its trusted fiduciary and consultant.

37.    MERITUS suffered actual damage from SALUD's fraudulent inducement that included, but was not limited to, seven million ($7M) dollars expended under the Agreement which it otherwise would have never agreed to, plus damages associated with the improper solicitation of a key faculty member, and the misappropriation of its intellectual property to a competing medical school.

### COUNT II:  Breach of Contract

38.    MERITUS incorporates herein by reference the allegations above as if set forth fully herein.

39.    By allowing its agent, servant and/or employee, Dr. Craft, to recruit and hire Dr. Berkowitz as a professor at Valley COM, SALUD breached ¶ 5.4 (non-solicitation) of the parties' Agreement.

40.    By placing a key individual in a fiduciary role without disclosing the clear conflict of interest, SALUD breached ¶ 6.2 (Misconduct of Key Individuals) of the parties' Agreement.

41.    By placing a key individual in a fiduciary role without disclosing the clear conflict of interest, SALUD breached Article III of the Agreement by allowing the misappropriation of MERITUS' intellectual property.

42.    By placing a key individual in a fiduciary role without disclosing the clear conflict of interest, as well as underperforming on its contractual obligations, failing to secure accreditation for Morgan State's medical school, and becoming embroiled in an embezzlement scandal at a

different collegiate institution, SALUD breached the aforementioned contractual obligation to act ethically, professionally, and competently.

43.    By disparaging MERITUS' business affairs with materially false allegations and implications contained in its public Complaint, SALUD further compounded its breach of ¶ 6.2 of the Agreement.

44.    By virtue of SALUD's conduct as set forth above, it irreparably violated the trust and fiduciary relationship with MERITUS in an incurable way.

45.    By virtue of SALUD's numerous breaches of the parties' Agreement including, but not limited to, those set forth above, MERITUS was legally entitled to terminate the parties' contract, with no further money due and owed for performance and milestones not-yet-achieved or performed by SALUD.

46.    By virtue of SALUD's numerous breaches of the parties' Agreement including, but not limited to, those set forth above, MERITUS is entitled to compensatory damages for the seven (7) million dollars it expended under the Agreement before learning of SALUD's transgressions.

WHEREFORE, the above-premises considered, MERITUS hereby seeks monetary damages against SALUD in the amount of seven (7) million dollars, a declaration that MERITUS legally terminated its Agreement with no further money due and owing, plus additional damages, costs, interest, and attorneys fees as allowed under the parties' Agreement.

Respectfully submitted,

WALKER, MURPHY & NELSON, LLP

/S/

John J. Murphy, Esq. (Bar No. 14407)
9210 Corporate Boulevard, Suite 320
Rockville, Maryland 20850
(301) 519-9150 (office)
(301) 519-9152 (fax)
jmurphy@walkermurphy.com
*Counsel for Plaintiffs*

## DEMAND FOR JURY TRIAL

MERITUS hereby demands a trial by jury on all issues raised herein.

Respectfully submitted,

WALKER, MURPHY & NELSON, LLP

/S/

John J. Murphy, Esq. (Bar No. 14407)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Counterclaim** was sent electronically and/or via first class mail, postage prepaid, on this ___26th_____ day of May, 2026, to:

Richard L. Renck, Esq.
1201 N. Market Street, Suite 501
Wilmington, DE 19801
RLRenck@duanemorris.com
*Attorneys for Plaintiff Medical Impact*
*Company, LLC d/b/a SALUD Education*

WALKER, MURPHY & NELSON, LLP

/S/

John J. Murphy, Esq. (Bar No. 14407)

12